IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs May 16, 2018

## STATE OF TENNESSEE v. JEROME EDWIN LOCKRIDGE

**Appeal from the Criminal Court for Davidson County**
**No. 2016-D-2205     Cheryl A. Blackburn, Judge**

_____

### No. M2017-01646-CCA-R3-CD

_____

The Appellant, Jerome Edwin Lockridge, was convicted in the Davidson County Criminal Court of attempted aggravated burglary, a Class D felony, and misdemeanor vandalism and received an effective four-year sentence to be served in confinement. On appeal, the Appellant contends that the evidence is insufficient to support his attempted aggravated burglary conviction because the State failed to prove that he entered the habitation with the intent to commit theft. Based upon the record and the parties' briefs, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which ALAN E. GLENN and ROBERT H. MONTGOMERY, JR., JJ., joined.

Emma Rae Tennent (on appeal) and Kristin Neff (at trial), Nashville, Tennessee, for the appellant, Jerome Edwin Lockridge.

Herbert H. Slatery III, Attorney General and Reporter; Clark B. Thornton, Senior Counsel; Glenn R. Funk, District Attorney General; and Doug Thurman, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I.  Factual Background

In November 2016, the Davidson County Grand Jury indicted the Appellant for aggravated burglary, possession of drug paraphernalia, and two counts of vandalism of property valued $500 or less. Before trial, the State reduced the charge of aggravated burglary to attempted aggravated burglary, dismissed the count of possessing drug paraphernalia, and dismissed one count of vandalism.

At the May 2017 bench trial, Derek Varnadore testified that in mid-April 2016, he rented a townhouse on Parthenon Avenue in Nashville. On April 30, he spent his second night in the home. About 1:00 a.m. on Sunday, May 1, Varnadore's wife heard "a bang coming from downstairs" and woke him. Varnadore went downstairs toward the kitchen. He saw that the window above the kitchen sink was open and that a right hand was on the brick ledge underneath the window. Varnadore said he "froze" and listened "to hear what was going on." No lights were on in the townhouse, but an exterior light above the window was shining on the window.

Varnadore testified that the blinds on the window were down and had been pushed off the windowsill. He then saw "a hand come through and push the blinds like trying to get a grip." At that point, Varnadore screamed and yelled to scare the intruder. The intruder "poked his head around" and saw Varnadore "through the gap." Varnadore yelled at the intruder to get out, and the intruder told Varnadore that he was coming in to get a trench coat and pants that were in a cabinet above the refrigerator. Varnadore stated, "And we had just moved in and already put everything -- the only thing we did that Saturday was unload the kitchen, so there was nothing in there and I knew that."

Varndadore testified that the intruder backed away so that Varnadore could no longer see his face but that the intruder's hands were still on the window. Varnadore's wife telephoned 911, and his mother-in-law brought him an unloaded shotgun. Varnadore told the intruder that he had a gun, "racked" the gun, and pointed it at the intruder. The intruder said he was homeless, "down on his luck," and "just coming in to get his pants and trench coat and [Varnadore] would never see him again." Varnadore told the intruder that he was not coming inside. The intruder saw the gun in Varnadore's hands and saw the gun pointed at him. The intruder told Varnadore to get his clothes for him. Varnadore started beating on a wall to get the attention of his landlord, who lived next door. The landlord went outside and started yelling at the intruder. Varnadore heard the blinds rattle again because the intruder was pushing on them again. Varnadore said that he tried to hit the intruder with the shotgun, that he "put a hole in the blinds," and that the intruder "took off."

Varndadore testified that three to four minutes after the intruder fled, the police arrived and found two people who matched the intruder's description. The police showed them to Varnadore, but neither was the man he saw at the window. Subsequently, the Appellant walked up to the townhouse. The police stopped him and asked Varnadore if the Appellant was the intruder. Varnadore told them yes. He also identified the Appellant in court as the intruder. He stated that the Appellant never threatened him and that the landlord fixed the window and blinds. Varnadore never found the Appellant's clothes.

- 2 -

On cross-examination, Varnadore testified that the Appellant claimed he had stayed in the townhouse and kept saying he wanted his clothes. During the incident, an outside flowerpot, a screen that had been on the window, and the blinds were broken. Varnadore acknowledged that the blinds broke when he "jabbed the butt" of the gun into the window to knock the intruder out of the window. On redirect examination, Varnadore testified that his wife's vehicle was in the garage but that his vehicle was parked in the driveway at the time of the incident.

Sergeant James Pierceall of the Metropolitan Nashville Police Department testified that on May 1, 2016, he received a burglary call on Parthenon Avenue and went to the scene. He looked outside the townhouse and saw a flowerpot beneath the kitchen window. A screen was beside the flowerpot and had a cut in it, and the blinds in the window were broken. Another officer stopped two suspects who matched the description of the intruder, and the police took Varnadore to view them. However, Varnadore said neither was the intruder.

Sergeant Pierceall testified that he went into the "back alley" and saw "a dark figure" walking in the alley. He stopped the man, who was the Appellant, and asked what the Appellant was doing. The Appellant "had mud all over him." Sergeant Pierceall turned on his flashlight and saw that the Appellant was wearing an Olive Garden apron. Sergeant Pierceall said the Appellant "was kind of incoherent, stating something about he was walking from -- or going to -- walking to or walking from Olive Garden." Officers brought Varnadore to look at the Appellant, and Varnadore identified him as the intruder. Sergeant Pierceall identified the Appellant in court as the man identified by Varnadore. After Sergeant Pierceall's testimony, the State rested its case.

The Appellant testified that in early March 2016, he lost his job and could no longer afford housing. He said he had "a habit of sleeping in vacant apartments, and just by the luck [he] happened to stumble upon this apartment" on Parthenon Avenue. The Appellant slept there about two and one-half weeks. He would enter the townhouse after 10:00 p.m., sleep on the second floor, and put up his belongings before he left. He said the residence "seemed abandoned" because the front door was unlocked and no furniture was in the townhouse.

The Appellant testified that at some point, he got a job at Olive Garden. About three days before this incident, he saw maintenance men checking on the townhouse. He did not sleep there again and began sleeping in another vacant apartment. However, he had left some clothes and a trench coat he was using as a blanket in the townhouse. On the night of April 30, the Appellant worked at Olive Garden. After work, he drank two beers and "maybe half of a half gallon of pineapple rum." He thought the townhouse on

Parthenon Avenue was still vacant, so he decided to return to get his clothes. He planned to retrieve his clothes and leave. The Appellant said that he usually entered the townhouse through the front door but that he thought the door would be locked after seeing the maintenance men. Therefore, he went to the kitchen window, which he had left unlocked. He took the screen off the window, put a flowerpot underneath the window to stand on, and lifted the window.

The Appellant testified that he tried to climb into the window until Varnadore confronted him. He told Varnadore he was homeless and "just wanted [his] clothes back." Varnadore told the Appellant that his clothes were not there, and the Appellant asked him to "please, check." Varnadore started banging on the wall, so the Appellant got nervous, "hopped down," and "took off." He went across the street where a building was being constructed and fell into a large hole. The Appellant had left his backpack leaning against the wall outside the townhouse, so he returned to the townhouse to get it.

The Appellant testified, "I guess I was a little more intoxicated than I thought." He said that when he returned to the townhouse, a police officer saw him. The Appellant tried to explain to the officer, but the officer grabbed him as soon as he started speaking. Officers put the Appellant into the back of a patrol car. A "guy" walked up to the car, nodded, and said "[Y]es, that's him."

On cross-examination, the Appellant first stated that he did not check the front door of the townhouse on May 1 to see if it was locked. He then said he "did check the front door" by twisting the knob. He stated that he thought the maintenance men had locked the door and that, due to his intoxication, he did not think anyone might be living in the townhouse. The Appellant had left the kitchen window unlocked in case he found the front door locked, so he went to the window. He said that he and Varnadore "froze" when they saw each other and that he thought he could "appeal" to Varnadore so that Varnadore would get his clothes for him. Although Varnadore said the Appellant's clothes were not there, the Appellant thought Varnadore "doesn't know." The Appellant said that he never saw Varnadore's shotgun and that he did not try to get into the townhouse after Varnadore told him he was not coming inside. The Appellant acknowledged that he had a laptop computer in his backpack and that he had bought beer and rum before he tried to enter the townhouse. He said that he had arranged to move into a new apartment on May 10 and that he was "in a bit of a celebratory mood" on May 1 "for being accepted into [his] new place."

The trial court convicted the Appellant of attempted aggravated burglary, a Class D felony, and vandalism of property $500 or less, a Class A misdemeanor. After a sentencing hearing, the trial court ordered concurrent sentences of four years and eleven months, twenty-nine days, respectively.

## II. Analysis

On appeal, the Appellant contends that the evidence is insufficient to support his attempted aggravated burglary conviction because the State failed to prove that he entered the townhouse with the intent to commit theft. The State argues that the evidence is sufficient. We agree with the State.

When an appellant challenges the sufficiency of the convicting evidence, the general standard of review by an appellate court is "whether, after viewing the evidence in the light most favorable to the prosecution, <u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e). The State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. <u>State v. Cabbage</u>, 571 S.W.2d 832, 835 (Tenn. 1978). Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact. <u>State v. Bland</u>, 958 S.W.2d 651, 659 (Tenn. 1997). Accordingly, in a bench trial, the trial judge, as the trier of fact, must resolve all questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence. <u>State v. Ball</u>, 973 S.W.2d 288, 292 (Tenn. Crim. App. 1998). The trial judge's verdict carries the same weight as a jury verdict. <u>State v. Hatchett</u>, 560 S.W.2d 627, 630 (Tenn. 1978).

A guilty verdict can be based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. <u>State v. Hall</u>, 976 S.W.2d 121, 140 (Tenn. 1998). "The [trier of fact] decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the [trier of fact].'" <u>State v. Rice</u>, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting <u>Marable v. State</u>, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" <u>State v. Dorantes</u>, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting <u>State v. Hanson</u>, 279 S.W.3d 265, 275 (Tenn. 2009)).

As charged in this case, aggravated burglary occurs when a person enters a habitation and commits or attempts to commit theft. Tenn. Code Ann. §§ 39-14-403(a); -402(a)(3). "Enter" means "[i]ntrusion of any part of the body." Tenn. Code Ann. § 39-14-402(b)(1). As this court has explained, the specific intent required for a burglary may be established by circumstantial evidence. <u>See</u> <u>Bollin v. State</u>, 486 S.W.2d 293, 296 (Tenn. Crim. App. 1972). Moreover, when a defendant breaks into and enters a building

- 5 -

containing valuable property with the absence of an "acceptable excuse" for doing so, the jury may "reasonably and legitimately infer . . . a defendant intends to commit theft." State v. Ingram, 986 S.W.2d 598, 699 (Tenn. Crim. App. 1998) (citing Hall v. State, 490 S.W.2d 495, 496 (Tenn. 1973)).

A criminal attempt occurs when a person acting with the kind of culpability otherwise required for the offense:

> (1) Intentionally engages in action or causes a result that would constitute an offense if the circumstances surrounding the conduct were as the person believes them to be;
>
> (2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or
>
> (3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

Tenn. Code Ann. § 39-12-101(a)(1)-(3).

Taken in the light most favorable to the State, the evidence shows that in April 2016, the Appellant slept in a vacant townhouse on Parthenon Avenue for more than two weeks. However, when he saw maintenance men in the townhouse, he stopped sleeping there and began sleeping somewhere else. In the early morning hours of May 1, the intoxicated Appellant returned to the townhouse. Although a car was parked in the driveway and the front door was locked, he entered the home through a window he had left unlocked for the express purpose of entering the residence. When the resident confronted the Appellant, the Appellant claimed he was coming inside to retrieve some clothes he had left in a kitchen cabinet above the refrigerator. However, the resident had just moved his property into the kitchen and knew the clothes were not there. Moreover, after the incident, the resident never found the Appellant's clothes. In pronouncing the Appellant guilty, the trial court stated that it did not "necessarily find him credible because it doesn't make any sense. . . . Getting his clothes back makes no sense at all to me." The trial court in this case discredited the Appellant's excuse that he was entering the townhouse to retrieve his clothes as was its prerogative. Accordingly, the evidence is sufficient to support the Appellant's conviction of attempted aggravated burglary.

- 6 -

### III.  Conclusion

Based upon the record and the parties' briefs, we affirm the judgment of the trial court.

_____
NORMA MCGEE OGLE, JUDGE